**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Eunice Arnetta Harris SPARKS,
Defendant–Appellant.**

No. 94–5721.

United States Court of Appeals,
Fourth Circuit.

Argued July 14, 1995.

Decided Oct. 27, 1995.

**ARGUED:** William Carlton Ingram, Jr., Floyd, Allen & Jacobs, L.L.P., Greensboro, North Carolina, for Appellant. Scott Patrick Mebane, Assistant United States Attorney, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Walter C. Holton, Jr., United States Attorney, Greensboro, North Carolina, for Appellee.

Before ERVIN, Chief Judge, and BUTZNER and PHILLIPS, Senior Circuit Judges.

Affirmed by published opinion. Senior Judge PHILLIPS wrote the opinion, in which Chief Judge ERVIN and Senior Judge BUTZNER joined.

## OPINION

PHILLIPS, Senior Circuit Judge:

In July 1992, a federal grand jury sitting in the Middle District of North Carolina indicted Eunice Arnetta Harris Sparks on two counts of making false loan applications to financial institutions in violation of 18 U.S.C. § 1014, and one count of falsely representing her true social security number for the purpose of obtaining items of value, in violation of 42 U.S.C. § 408(a)(7)(B). In November of that year, Sparks pled guilty to one count of violating § 1014 and to the offense of violating § 408(a)(7)(B). Several months later, but before sentencing, Sparks moved under Fed. R.Crim.P. 32(d) (1994) to withdraw her guilty pleas. The district court denied Sparks's motion and sentenced her to 52 months imprisonment. Sparks's sole contention on appeal is that the district court erred in denying her Rule 32(d) motion. We disagree and affirm.

## I.

The indictment in this case is based on three distinct loans that Sparks took out between August 1990 and September 1991 from three separate lenders for three different cars. The following facts are not in dispute.

In August 1990, Sparks furnished a false social security number on an application to United National Bank, an FDIC-insured institution, for a loan to purchase a 1985 Cadillac Seville. The bank extended a loan of $2500 and Sparks bought the car. Sparks did not, however, make any payments on the loan and, in due course, United National repossessed the car. In July 1991, the same pattern repeated itself with only minor variations—this time Sparks approached a different FDIC-insured bank (Wachovia), used an alias ("Eunice McCrae Sparks"), sought a different car (a 1991 Pontiac Grand Prix), and furnished a different (but equally false) social security number. The result, however, was the same: the bank granted the loan and ultimately repossessed the car when Sparks had failed to make a single payment. Also in 1991, Sparks used a third false social security number to finance the purchase of an automobile with MCM Auto Sales.

On October 15, 1992, Sparks, accompanied by her counsel James Swindell, appeared in federal district court to enter a plea of guilty to the charge of violating 42 U.S.C. § 408(a)(7)(B) and to one count of violating 18 U.S.C. § 1014, pursuant to a written plea agreement. The district court engaged Sparks in a lengthy Rule 11 colloquy during which Sparks acknowledged that she was pleading guilty because she was guilty of the offenses charged in Counts II and III. However, noting "some hesitation" in Sparks's answer, the judge prompted Sparks to elaborate. Sparks then explained, in a somewhat disjointed and sketchy fashion, that she provided false social security numbers on loan applications because such numbers were given to her by a private firm "which was advertising to clear your credit," which she paid $1200, and which guaranteed "that ev-

erything was legal." Sparks also expressed her belief that she had retained at her home some literature from the firm in question, but acknowledged that she had not shown them to her attorney, Swindell, and, in fact, had only discussed the issue with him "[v]aguely." At that point, the district court said:

> Well, I'm not going to accept your pleas of guilty at this time, and I want you to go home and find whatever it is you got and bring it to Mr. Swindell. And he will look into seeing whether or not he can develop a defense from that.

Later that month, Sparks appeared in court to request appointment of new counsel for reasons that do not appear in the record. The district court granted the request, appointed Mr. William Ingram, and relieved Swindell.

On November 13, Sparks returned to court and again attempted to enter a plea of guilty to Counts II and III pursuant to a written plea agreement. The district judge conducted a Rule 11 colloquy during which he explained that Sparks could not be convicted under either count unless the government proved her guilt beyond a reasonable doubt. The judge specified that the jury could not convict unless it found, among other things, that Sparks represented a number to be her true social security number when she knew "at that time" that the number was not her actual number. In order to be guilty of the offense charged in Count II, the court elaborated, Sparks must have provided the false numbers "for the purpose of misleading [Wachovia] bank." To be guilty under Count III, Sparks had to falsely represent her social security number "knowingly and willfully, with the intent to deceive, that means to cheat." Making no reference to the credit rehabilitation firm that she had mentioned at her earlier plea hearing, Sparks again acknowledged that she was pleading guilty because she was guilty. Consequently, at the conclusion of the colloquy, the district court accepted Sparks's guilty pleas as "knowingly and voluntarily made with full understanding of the nature of the charges and the consequence of the plea."

At the subsequent sentencing hearing held in April 1993, Sparks objected to two matters in the presentence report: a two-level increase for obstruction of justice, and the lack of credit for acceptance of responsibility. The probation officer made that two-fold recommendation based on Sparks's failure to disclose a Maryland felony conviction for forgery which resulted in a prison sentence in the early 1980s. Sparks testified at the hearing that she could not recall the conviction or imprisonment. The district court continued sentencing to allow for resolution of the issues involving Sparks's prior Maryland conviction. At this point the judge also told Mr. Ingram that he "would like to know more about" Sparks's possible reliance on the credit rehabilitation firm that Sparks had mentioned when represented by Mr. Swindell.

When sentencing resumed in June 1993, Sparks asked to withdraw her guilty pleas and Ingram produced for the court's inspection the documents to which Sparks had apparently referred at the October 15th hearing. The principal document, which (according to Ingram) Sparks said she received in the mail after responding to a television commercial, was a four-page mass-marketing letter from "Kevin Benson" of the "Trust Group" in Savannah, Georgia. That letter offered, for $49, step-by-step instructions on how to take advantage of a government program in "credit file segregation" whereby "the Federal Government will supply you with a new number that you can use in place of your Social Security number for banking and credit purposes." The other two documents were a printed reply card for the Trust Group and a photocopy of a receipt for a $150 "filing fee" payment made by Sparks to the Group.[1] Ingram explained that although he had seen the documents "for the first time today," Sparks had tried to communicate the story to him earlier but that he "was hearing but not listening well." For that reason, he had not yet conducted any investigation into the matter.

---

1. Apparently, Sparks makes no effort to reconcile the $1200 she said that she paid the Trust Group (and of which the $150 receipt reflects only partial payment) with the $49 advertised fee.

The government objected to allowing Sparks to withdraw her guilty plea on the ground that even if the documents were genuine they "wouldn't have any bearing on whether the defendant actually intended to commit the crime[s charged] in light of the previous admission she made." The "previous admission" referred to statements that Sparks allegedly made to Special Agent Robert Myers of the United States Secret Service during an interview in April 1992. Myers testified that Sparks told him that the Trust Group had directed her to an office in Winston–Salem (which, according to Sparks, was no longer in operation) where she had been assigned substitute social security numbers. According to Myers, Sparks "said that she knew what she was doing was wrong but that she could not get credit using her own name and Social Security number."

The district court continued sentencing to give Sparks an opportunity to file a written motion to withdraw her guilty plea. After Sparks had submitted her motion and the government had opposed, the district court addressed the issue in a thorough memorandum opinion and order. Applying the six-factor test set forth in *United States v. Moore,* 931 F.2d 245, 248 (4th Cir.), *cert. denied,* 502 U.S. 857, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991), the court concluded that four of the factors cut against Sparks, did not identify any that weighed in her favor, and denied the motion.

Sentencing resumed two days later. Determining that Sparks's 34 criminal history points actually understated her vast criminal history of passing bad checks and forgery and uttering, the court departed upward from the guideline range and sentenced Sparks to 52 months imprisonment.

Sparks filed a timely notice of appeal.

## II.

Rule 32 provides that, before sentencing, "the court may permit withdrawal of [a guilty] plea upon a showing by the defendant of any fair and just reason." Fed. R.Crim.P. 32(d) (redesignated 32(e) effective December 1, 1994). In *United States v. Moore* we articulated six factors for a court to consider in assessing whether the reason advanced by the defendant is "fair and just" within the meaning of the rule:

> (1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary, (2) whether the defendant has credibly asserted his legal innocence, (3) whether there has been a delay between the entering of the plea and the filing of the motion, (4) whether defendant has had close assistance of competent counsel, (5) whether withdrawal will cause prejudice to the government, and (6) whether it will inconvenience the court and waste judicial resources.

931 F.2d at 248. A district court's assessment of these factors is reviewed on appeal for abuse of discretion. *United States v. Lambey,* 974 F.2d 1389, 1393 (4th Cir.1992) (en banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 672, 130 L.Ed.2d 605 (1994); *Moore,* 931 F.2d at 248.

In the present case, the district court answered the first two factors in the negative and the next two factors in the affirmative. Having determined, then, that the first four factors all militated against Sparks, the court denied her motion without expressly addressing factors five and six. Sparks disagrees with the district court's assessment of the first four factors, contending that the first, second, and fourth all weigh in her favor. (Sparks concedes that the third factor weighs against her: there was considerable delay between her first attempt to plead guilty— October 15, 1992—and her motion to withdraw her guilty plea on June 7, 1993.) She also claims that the factors that the district court did not expressly consider—the fifth and sixth—both recommend that her motion be granted. She argues, in short, that the district court abused its discretion in denying her motion because: she had offered credible evidence that her guilty plea was not knowing and voluntary; she credibly asserted her legal innocence; she did not enjoy close assistance of competent counsel; and granting the motion would neither prejudice the government nor waste judicial resources. For the reasons that follow, we find no abuse of discretion.

### A.

The thorniest question on appeal involves the second of the *Moore* factors: legal innocence. Sparks argues that the documents she presented from the Trust Group credibly indicated that the numbers she represented to be her actual social security number on the loan applications she submitted to Wachovia Bank (Count II) and MCM auto sales (Count III) were furnished to her, for a fee, by the Trust Group and that she used them only out of a good faith belief that the numbers were originally provided by the federal government and that it was legal to do so. The district court concluded that, even if all the facts Sparks alleged were true and that Sparks honestly believed that her conduct was lawful, her story does not amount to a viable claim of legal innocence.[2] More particularly, as we will explain, Sparks's allegations that she relied in good faith on representations by the Trust Group can neither defeat the elements in the government's *prima facie* case nor make out a successful affirmative defense.

### 1.

Section 1014 of 18 U.S.C. provides in relevant part:

> Whoever knowingly makes any false statement ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation ... upon any application ... or loan ... shall be [guilty of a crime].

18 U.S.C.A. § 1014 (West Supp.1995). We have previously identified the four essential elements of the crime which the government must prove beyond a reasonable doubt:

> (1) that defendant made a false statement to a bank; (2) that he did so for the purpose of influencing the bank's action; (3) that the statement was false as to a

material fact; and (4) that the defendant made the false statement knowingly.

*United States v. Bonnette,* 663 F.2d 495, 497 (4th Cir.1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 666 (1982).

There is no dispute that the first three elements are satisfied in this case: Sparks submitted to the FDIC-insured Wachovia bank a number that was not in fact her social security number, representing that it was her social security number, and did so for the purpose of obtaining an automobile loan. Sparks urges, however, that she did not make the false representation knowingly.

This argument fails for a simple reason. Sparks acknowledged to Secret Service Agent Myers and to the district court during her first Rule 11 colloquy that she knew that the numbers allegedly supplied by the Trust Group, and which she used on her loan applications, were not true replacement social security numbers. Therefore, when Sparks supplied the new numbers furnished her by the Trust Group on that part of the loan applications that asked for her social security number (and not, it bears emphasis, for either her social security number or a functional equivalent), she was making a false statement knowingly and willfully. In sum, then, Sparks was unquestionably guilty of all essential elements that constitute the crime of violating 18 U.S.C. § 1014.

Sparks next argues that her good faith reliance on the Trust Group manifests the lack of intent to deceive that constitutes a valid affirmative defense in a prosecution under § 1014. The district court, however, followed the Ninth Circuit's holding in *United States v. Wilcox,* 919 F.2d 109 (9th Cir. 1990), that the presence or absence of an intent to deceive is simply irrelevant to the defendant's guilt; the only specific intent that matters for purposes of § 1014 is the

---

2. In the alternative, the district court also briefly noted some doubts about the truth of Sparks's story. Because Sparks used several different social security numbers, the court explained, she is "unable to credibly assert that she acted in good faith by using 'a' permissible substitute number given by some credit rehabilitation service in place of her social security number." Sparks counters that the district court's skepticism is based on a misreading of the record: she insists that she had always maintained that the Trust Group had given her four different numbers. Since we agree with the court's primary conclusion that the facts alleged do not add up to legal innocence, we need not address Sparks's challenge to the court's determination that her factual allegations were not credible.

intent to influence the bank's actions. *See also United States v. Sabatino,* 485 F.2d 540, 544–45 (2d Cir.1973), *cert. denied,* 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974). We agree. Although we have not previously addressed the question whether lack of intent to deceive is a valid affirmative defense in a prosecution under § 1014, we have expressly held that intent to deceive is immaterial in a prosecution under the general federal criminal fraud statute, 28 U.S.C. § 1001. *Nilson Van & Storage Co. v. Marsh,* 755 F.2d 362, 367 (4th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 53 (1985). The language[3] and purposes of the two statutes provide no apparent reason for reaching a different conclusion here. Moreover, in light of the fact that some of the federal fraud statutes do specifically condition criminal liability on the specific intent to defraud or to deceive, *e.g.,* 18 U.S.C. §§ 1002, 1005, 1006, 1012, 1013, we must assume that the absence of any such requirement in § 1014 reflects a purposeful choice by Congress. *Cf. United States v. Yermian,* 468 U.S. 63, 70–74, 104 S.Ct. 2936, 2940–42, 82 L.Ed.2d 53 (1984) (reinforcing conclusion that § 1001 lacks requirement of specific intent to deceive by reference to unenacted version of statute that contained such a requirement). We will not frustrate that congressional decision by recognizing a defendant's lack of intent to deceive as an affirmative defense to a prosecution under 18 U.S.C. § 1014.

### 2.

■ Sparks also argues that her reliance on the Trust Group makes her legally innocent of the second charge of the indictment to which she pled guilty—falsely representing a number to be her true social security number in violation of 42 U.S.C. § 408(a)(7)(B). The elements of that offense are that the defendant (1) falsely represented a number to be her social security number (2) with the intent to deceive another person (3) for the purpose of obtaining something of value. *See generally United States v. Bales,* 813 F.2d 1289, 1297 (4th Cir.1987) (discussing

§ 408(g)(2), the predecessor to current § 408(a)(7)(B)). Sparks concedes that her allegations do not negate the first and third elements. She argues only that she credibly alleged that she lacked the requisite intent to deceive. We disagree.

■ Whatever her involvement with the Trust Group may have been, we have no doubt that Sparks did in fact intend to deceive the lenders in conjunction with her purchase of a car through MCM auto sales. She knew (1) that the lenders wanted her social security number so they could ascertain her credit history, (2) that they would reject her loan application if they knew her true credit history, and (3) that the sole reason for substituting new numbers under a credit file segregation plan in lieu of her actual social security number was to prevent the lenders from discovering her true identity—and thus her true credit history. Indeed, the Trust Group brochure makes clear that the purpose of "credit file segregation" is to direct the attention of would be lenders to an applicant's new credit file which, unlike the applicant's "current credit file [which] will still exist," will not disclose the borrower's "negative credit history." These facts paint an unmistakable picture of intentional deception. Sparks rejoins that the Trust Group led her to believe that the government had approved and facilitated such deception of lenders—presumably to effectuate a judgment that people in Sparks's position deserve a second chance. Unfortunately for Sparks, that response is of no legal consequence. Sparks was not, after all, charged with intending to deceive the federal government. The fact, if true, that the federal government sanctioned her deception would not make her conduct less deceptive to the would-be lenders. It would just mean that deception was legally authorized. But, of course, it was not. Therefore, Sparks's contention that she lacked the intent to deceive that is a prerequisite for conviction under 42 U.S.C. § 408(a)(7)(B) is nothing other than an attempt to rely on a defense of mistake of law.

---

**3.** Section 1001 provides in pertinent part: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies ... a material

fact, or makes any false, fictitious or fraudulent statements or representations ... shall be fined under this title or imprisoned." 18 U.S.C.A. § 1001 (West Supp.1995).

That, however, is no defense at all. *United States v. Kelly*, 718 F.2d 661, 665 (4th Cir. 1983).[4]

### 3.

In sum, Sparks's insistence that she relied on representations made by the "Trust Group" in good faith simply misses the point. In order to satisfy the second *Moore* factor, Sparks must do more than just demonstrate that she had a bona fide belief that her actions were lawful. She must show that such a belief would translate into a credible assertion of legal innocence. The district court explained at length why it would not. Put briefly, even if Sparks's allegations are all deemed credible, there is no doubt (1) that Sparks knew that the number she provided as her social security number was not her social security number; and (2) that she provided that other number in lieu of her actual security number to deceive would-be lenders. That is enough to dispel her claims of legal innocence to both charges. It is a matter of indifference to the law whether Sparks honestly believed either that the number she provided was a functional equivalent of her actual number for purposes of her loan applications or that she enjoyed the effective permission of the United States government to deceive the lender. Accordingly, the district court properly determined that Sparks had not credibly asserted that she was legally innocent of either of the two offenses to which she had pled guilty.

### B.

Sparks's further challenges to the district court's application of the *Moore* test require less comment.

### 1.

In its memorandum opinion, the district court determined both that the Rule 11 colloquy established that Sparks's plea was knowing and voluntary and that she was closely assisted by competent counsel. Sparks asserts in response that there was a "breakdown in communication between the defendant and her attorneys" regarding Sparks's reliance on the Trust Group insofar as both attorneys did not understand the historical facts and/or the facts' legal significance. "Therefore," Sparks concludes, "although neither Mr. Swindell nor Mr. Ingram necessarily can be said to have provided incompetent counsel to the defendant, ... the defendant did not receive competent advice, and therefore her guilty pleas were not knowingly or voluntarily entered." We disagree.

▮▮▮ A defendant can demonstrate the absence of close assistance of counsel for purposes of the *Moore* test only by showing that her "counsel's performance fell below an objective standard of reasonableness." *Lambey*, 974 F.2d at 1394 (internal quotation, citations omitted). Especially in light of our conclusion that the facts allegedly surrounding Sparks's reliance on the Trust Group would not negate her guilt in the eyes of the law, Sparks's insistence that her attorneys did not fully appreciate those facts does not demonstrate objectively incompetent representation. Therefore, the district court properly found that Sparks did have "close assistance of competent counsel." Furthermore, because Sparks's argument with regard to the first *Moore* factor is not that her guilty plea was actually involuntary, but rather that her attorneys' failure to advise her that she had a strong triable defense rendered the plea not "knowing," our evaluation of the fourth *Moore* factor answers this contention too: Sparks has not shown that her plea

---

4. As the district court recognized, there is an exception for good faith reliance on the advice of an expert or government official. The court determined, however, that Sparks cannot benefit from the defense of reliance on an expert because there is no evidence that any representative of the Trust Group with whom Sparks dealt was an "expert" within the meaning of that defense—i.e., either an attorney or a certified public accountant. Similarly, observing that the defense of good faith reliance on a government official "is limited to objectively reasonable reliance only on those with actual authority, and may not be based on reliance on someone whom the defendant subjectively believes has authority," the district court concluded that Sparks could not take advantage of that defense either. *See, e.g., United States v. Duggan*, 743 F.2d 59, 84 (2d Cir.1984) (defendant may not be "exonerated on the basis of his reliance on an authority that is only apparent and not real"). Sparks does not challenge these rulings.

**1154**

"was not knowing or not voluntary." In short, the district court did not abuse its discretion in assessing the first and fourth factors of the *Moore* test.

#### 2.

Lastly, Sparks argues that, because the government's case is essentially a paper one that has not grown stale, and a trial on the charges would take no more than two days, "allowing the defendant to withdraw her guilty plea will neither cause prejudice to the government, nor inconvenience the court or waste judicial resources." Even were we to agree that these two factors militate in her favor [5]—and the government contests the former proposition but is silent as to the latter—we would not find an abuse of discretion.

It bears emphasis that *Moore* did not purport to set forth a rigidly mechanistic test, for the conspicuous fuzziness of Rule 32(d)'s operative terms—"fair and just"—precludes such an endeavor. Rather, *Moore* articulated six considerations that should inform a district court's inescapably impressionistic judgment as to whether a defendant's reasons for moving to withdraw her guilty plea are sufficient to satisfy the language and purpose of Rule 32. Consequently, there is no reason to think that *Moore*'s six factors are all of equal weight. Indeed, the contrary is true. Because it is essential to an orderly working of the criminal justice system that guilty pleas tendered and accepted in conformity with Rule 11 can be presumed final, *see Lambey*, 974 F.2d at 1394–95, it is the defendant's burden to demonstrate that she should be permitted to withdraw her plea. *Moore*, 931 F.2d at 248. The factors that speak most straightforwardly to the question whether the movant has a fair and just reason to upset settled systemic expectations by withdrawing her plea are the first, second, and fourth. In contrast, the third, fifth, and sixth factors are better understood as countervailing considerations

that establish how heavily the presumption should weigh in any given case. That being so, we think that where, as here, a district court adjudicating a Rule 32 motion to withdraw a guilty plea determines that the first four factors identified in *Moore* militate against granting the defendant's motion, it can reasonably refrain from trying to ascertain just how much withdrawal of the plea would prejudice the government and inconvenience the court. Put otherwise, because very slight prejudice and inconvenience would not, *by themselves*, constitute a "fair and just" reason to grant the motion, the district court did not err in failing expressly to evaluate the fifth and sixth *Moore* factors.

#### III.

For the foregoing reasons, we conclude that the district court did not abuse its discretion in denying Sparks's motion to withdraw her guilty pleas.

*AFFIRMED.*

---

5. We note that, despite the precise language of the *Moore* test, factors five and six—like, at least, factor three—generally call for qualitative judgments, not binary ones. Because withdrawal of a guilty plea almost invariably prejudices the government to some extent and wastes judicial resources, the fifth and sixth factors can weigh in the defendant's favor so long as she shows that the magnitudes of the prejudice and inconvenience are small; the defendant need not show that the effects will be nonexistent.