**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-4583**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

AMIR GOLESTAN,

Defendant - Appellant.

---

**No. 23-4592**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MICFO, LLC,

Defendant - Appellant.

---

Appeals from the United States District Court for the District of South Carolina, at Charleston.   Richard Mark Gergel, District Judge.   (2:19-cr-00441-RMG-1; 2:19-cr-00441-RMG-2)

---

Argued:  January 31, 2025                          Decided:  August 22, 2025

---

Before DIAZ, Chief Judge, HARRIS and BERNER, Circuit Judges.

_____

Affirmed by published opinion.  Judge Berner wrote the opinion, in which Chief Judge Diaz and Judge Harris joined.

_____

**ARGUED:**   Jeremy A. Thompson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbia, South Carolina; Richard Klugh, LAW OFFICE OF RICHARD C. KLUGH PH1, Miami, Florida, for Appellants.  Andrea Gwen Hoffman, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee.  **ON BRIEF:** Adair F. Boroughs, United States Attorney, Columbia, South Carolina, Amy F. Bower, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee.

_____

BERNER, Circuit Judge:

Amir Golestan was the founder and CEO of Micfo, LLC, a technology company. Golestan pled guilty, on behalf of himself and on behalf of his company, to 20 counts of wire fraud for fraudulently obtaining and reselling Internet Protocol addresses. After the guilty pleas had been entered, Golestan moved to withdraw them, arguing that intervening Supreme Court precedent invalidated the theory of prosecution for the wire fraud convictions. The district court denied Golestan's motion.

Golestan also maintains that the district court erred in failing to advise him of the immigration consequences of his guilty plea and that his counsel was ineffective for failing to advise him of those consequences. Separately, Micfo asserts that Golestan lacked the requisite authority to enter guilty pleas on its behalf.

We affirm the judgments of conviction for both Golestan and Micfo.

## I. Factual Background

### A. IP Addresses and ARIN

This case concerns Internet Protocol (or IP) addresses. An IP address is a unique numeric label assigned to each device, such as a computer or smartphone, that connects to the Internet to send and receive information. In the United States, a single nonprofit organization, the American Registry for Internet Numbers (ARIN), is responsible for administering, allocating, and assigning IP addresses. When an individual or an entity wants to obtain an IP address, it submits a request to ARIN. An analyst then reviews the request and assigns a new IP address or transfers an existing one. Recipients are required

3

to enter into a Registration Services Agreement with ARIN prior to being assigned IP addresses.

There are several versions of IP addresses, most recently version four, IPv4, and version six, IPv6. IPv4 addresses are considered to be more valuable than their IPv6 counterparts principally due to their compatibility with existing networks and infrastructure, which were designed with IPv4 in mind. IPv4 addresses are limited. Although the global pool of free IPv4 addresses was exhausted in 2011, ARIN still had its own pool of IPv4 addresses. As a result of the high demand for IPv4 addresses, "ARIN often required justification and customer identification for additional IPv4 address blocks" to verify the validity of IPv4 requests. J.A. 22.[1] ARIN eventually exhausted its allocation of free IPv4 addresses in 2015. Although a secondary market now exists outside of ARIN to purchase, sell, and transfer IPv4 addresses, ARIN maintains a role in this process by overseeing the transfer of IP addresses from user to user.

## B. Criminal Scheme

Amir Golestan was the owner and CEO of Micfo, LLC (Micfo). Micfo purported to provide hosting services to Internet providers and businesses to allow these entities to display their websites on the Internet. This sometimes required Micfo to allocate IP addresses to its customers.

Initially, Micfo requested IPv4 addresses lawfully and in accordance with ARIN's policies and procedures. By 2014, however, Micfo began to engage in a criminal scheme

---

[1] Citations to "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

to obtain IP addresses from ARIN. Golestan and Micfo created several fictitious companies, collectively referred to as "Channel Partners," to justify the need to be assigned more IP addresses from ARIN. Golestan even invented fictitious individuals who he represented were officers of the Channel Partners and submitted fraudulent documentation to ARIN under the names of these fictitious individuals. Through the Channel Partners, Golestan then began to request IPv4 addresses directly from ARIN. In total, Micfo and the Channel Partners obtained approximately 1.3 million IPv4 addresses through this fraudulent scheme.

Golestan sold some of the IPv4 addresses through third party brokers. Through this scheme he made approximately $3.3 million in profits. When Golestan attempted to sell the rights to additional IPv4 addresses, however, his criminal plot was uncovered. ARIN "red flagged" Golestan's attempt to sell $6 million worth of IPv4 addresses and blocked the transfer of these IPv4 addresses. J.A. 217–18.

## C. Procedural History

A federal grand jury indicted Golestan and Micfo, as a corporate defendant, on 20 counts of wire fraud, in violation of 18 U.S.C. § 1343.

### 1. Motion to Dismiss the Indictment

Golestan and Micfo moved to dismiss the indictment, arguing that it was defective because it failed to allege facts that, even if true, could sustain a violation of the wire fraud statute. Golestan and Micfo asserted that they did not obtain money or property by means of false or fraudulent pretenses because IP addresses are not "property" within the meaning of the wire fraud statute. The Government responded that the rights to use and assign an IP

5

address satisfies the relevant definition of property. The district court agreed with the Government and denied the motion to dismiss.

## 2. Bench Trial

The parties proceeded to a bench trial, where Golestan and Micfo were represented by the same defense counsel. During the first day and a half of trial, the Government presented eight witnesses. Although defense counsel had repeatedly informed the court of Golestan's plan to present evidence to show that the Channel Partners were legally recognized entities, his defense counsel subsequently stated that he was unable to produce such evidence. Defense counsel asked the district court for time to confer with the Government. Following a 30-minute break, Golestan and Micfo moved for a change of plea from not guilty on all counts to guilty.

That same day, the district court proceeded with a plea colloquy. Golestan first pled guilty in his personal capacity. Relevant to this appeal, the district court did not mention any immigration consequences that could result to Golestan from pleading guilty to wire fraud. Indeed, the only mention of Golestan's citizenship was in the following colloquy:

> THE COURT: Mr. Golestan, what is your citizenship status?
> THE DEFENDANT: I'm a naturalized United States citizen.
> THE COURT: Now that I've discussed your rights with you, sir, do you still wish to plead guilty?
> THE DEFENDANT: Yes, Your Honor.

J.A. 430.

Following his guilty plea, Golestan also pled guilty in his corporate capacity on behalf of Micfo. During the plea colloquy, Golestan confirmed that he had the authority to enter a guilty plea on behalf of the company:

6

THE COURT: Now I've gone through—what was your title with Micfo?

THE DEFENDANT: I was the Executive Director. However, initially, when I filed for Chapter 11 personal bankruptcy, I was later voluntarily converted it into Chapter 7. And as a result of the conversion, the hundred percent membership interest became the interest of the bankruptcy state.

THE COURT: Well—

THE DEFENDANT: And now I have been essentially elected as the manager of the company.

THE COURT: Okay. And you have the capacity to plead the corporation guilty, do you not?

THE DEFENDANT: Yes, Your Honor. . . .

THE COURT: And you're pleading Micfo guilty to all 20 counts?

THE DEFENDANT: That is correct, Your Honor.

J.A. 438–39.

The district court accepted Golestan's guilty plea both on behalf of himself and Micfo.

The district court rescheduled Golestan and Micfo's sentencing several times, resulting in an approximately 17-month lapse between the change of plea hearing and Golestan and Micfo's sentencing. During this period, the parties completed supplemental briefing, requested additional time to file objections to the presentence investigation report (PSR), and the Government moved to revoke Golestan's bond, among other proceedings and motions.

### 3. Motion to Continue Sentencing

Golestan moved to continue his sentencing until the Supreme Court decided the then-recently argued case of *United States v. Ciminelli*, 598 U.S. 306 (2023). The district court denied Golestan's motion, concluding that the theory of wire fraud liability at issue

7

in *Ciminelli* was inapplicable to Golestan, who pled guilty based on traditional wire fraud principles.

#### 4. Motion to Withdraw Guilty Plea

One day after the district court's denial of his motion to continue, Golestan moved to withdraw his guilty plea. He asserted that he was legally innocent because his conduct did not meet the statutory requirements for federal wire fraud, incorporating his *Ciminelli* arguments from his motion to continue, and he argued that Federal Rule of Criminal Procedure 11(b)(1)(O) required the district court to advise him that denaturalization was a possible immigration consequence of his guilty plea. In a single sentence, without any further explanation, Golestan also noted that he "has been told that he might not have had the ability to act on behalf of Micfo because he was only a manager/employee and not a member or officer of the company." J.A. 451.

The district court denied Golestan and Micfo's motion to withdraw their guilty pleas.[2] The district court ruled that *Ciminelli* did not impact Golestan's guilty plea because that case involved the "right-to-control" theory of wire fraud, a theory only followed in the Second Circuit. Here the Government had relied on traditional wire fraud principles. The district court also ruled that, because Golestan was a naturalized American citizen, Rule 11 did not require the district court to advise Golestan at his plea colloquy that he may be at risk of deportation. Finally, with respect to Micfo's guilty pleas, the district court noted that

---

[2] The district court interpreted Golestan's motion to withdraw his guilty plea as a motion to withdraw both Golestan and Micfo's guilty pleas. We adopt this interpretation for purposes of our analysis.

Golestan affirmatively represented under oath during the plea colloquy that he had the authority to enter the plea on Micfo's behalf. The district court concluded that Golestan's generalized assertion that "someone" told him that he lacked the requisite authority to enter a plea on behalf of the company is not sufficient to affect the validity of the plea. Golestan filed a motion to reconsider, which the district court subsequently denied.

## 5. Sentencing

The district court sentenced Golestan to 60 months' incarceration and ordered him to pay approximately $77,000 in restitution. It sentenced Micfo to 30 days' probation. It also ordered Golestan and Micfo to forfeit any rights to enumerated IP addresses and $3.3 million of profits from the fraudulent sales. This timely appeal followed.

## II. Analysis

Golestan and Micfo contend that the district court erred in denying their motions to withdraw their guilty pleas. They principally argue that the Government charged them with wire fraud under a theory of liability made impermissible by *Ciminelli v. United States*, 598 U.S. 306 (2023). Golestan also maintains that the district court erred in failing to advise him of the immigration consequences of his guilty plea and that his counsel was ineffective for failing to advise him of those consequences. Micfo separately asserts that Golestan

9

lacked the requisite authority to enter a guilty plea on its behalf. We address these arguments in turn.

## A. Withdrawal of Golestan's Guilty Plea

A district court's denial of a motion to withdraw a guilty plea is reviewed under the abuse of discretion standard. *United States v. Mayberry*, 125 F.4th 132, 140–41 (4th Cir. 2025). "A district court abuses its discretion when it acts in an arbitrary manner, when it fails to consider judicially-recognized factors limiting its discretion, or when it relies on erroneous factual or legal premises." *United States v. Nicholson*, 676 F.3d 376, 383 (4th Cir. 2012) (quoting *United States v. Henry*, 673 F.3d 285, 291 (4th Cir. 2012)). Federal Rule of Criminal Procedure 11(d)(2)(B) permits a defendant to withdraw a guilty plea before sentencing if "the defendant can show a fair and just reason for requesting the withdrawal." The defendant bears the "heavy burden of persuasion" to show that such a fair and just reason exists. *United States v. Thompson-Riviere*, 561 F.3d 345, 348 (4th Cir. 2009) (citation omitted).

### 1. Failure to Provide an Immigration Warning at the Plea Colloquy

Golestan maintains that the district court abused its discretion in denying his motion to withdraw his guilty plea because the district court had failed to advise him of the immigration consequences of his guilty plea in violation of Federal Rule of Criminal Procedure 11(b)(1)(O). Although we agree that the district court erred in failing to provide this warning, we find its failure to do so harmless.

Rule 11 of the Federal Rules of Criminal Procedure standardized the procedure for entering guilty pleas in federal criminal proceedings. *United States v. Damon*, 191 F.3d

10

561, 564 (4th Cir. 1999). It "provides that the court must personally inform the defendant of, and ensure that he understands, the nature of the charges against him and the consequences of his guilty plea." *Id.*

At issue here is Rule 11(b)(1)(O), which mandates that district courts "*must* inform the defendant of, and determine that the defendant understands" that "if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future." Fed. R. Crim. P. 11(b)(1)(O) (emphasis added). The Advisory Committee Notes explain that "the most effective and efficient method of conveying this information is to provide it to every defendant, without attempting to determine the defendant's citizenship." Fed. R. Civ. P. 11(b)(1)(O) Advisory Committee's Note to 2013 Amendment. The Rule was amended following the Supreme Court's decision in *Padilla v. Kentucky*. 559 U.S. 356 (2010). There, the Court held that the Sixth Amendment requires defense counsel to inform her client whether her guilty plea carries a risk of deportation. *Id.* at 374–75. The importance of the conveyance of the information in Rule 11 cannot be overstated. Immigration consequences—whether they be deportation or denaturalization—can have devastating outcomes on individuals, their families, and their communities. "[D]enaturalization, like deportation, may result in the loss 'of all that makes life worth living.'" *Knauer v. United States*, 328 U.S. 654, 659 (1946) (citation omitted). The Supreme Court has described denaturalization and deportation as severe penalties. *Padilla*, 559 U.S. at 365 (citation omitted); *Klapprott v. United States*, 335 U.S. 601, 612 (1949); *see Schneiderman v. United States*, 320 U.S. 118, 122 (1943) (explaining that American

11

citizenship provides "priceless benefits"); *Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947) ("Deportation can be the equivalent of banishment or exile. The stakes are indeed high and momentous for the [noncitizen] who has acquired his residence here.").

Any "variance from the requirements" of Rule 11, including a failure to inform a defendant of the enumerated rights in Rule 11(b)(1), is reviewed for harmless error. Fed. R. Crim. P. 11(h). An error is harmless if it does not affect "substantial rights." *Id.*; *see United States v. DeFusco*, 949 F.2d 114, 116–17 (4th Cir. 1991). In determining whether a Rule 11 error affected a defendant's substantial rights, we must consider "what information was provided to the defendant when he pleaded guilty, what additional information would have been provided by a proper Rule 11 colloquy, and how the additional information would have affected the decision to plead guilty." *United States v. Hairston*, 522 F.3d 336, 341 (4th Cir. 2008). If our review of the record indicates that the district court's failure "'influenced the defendant's decision to plead guilty' and 'impaired his ability to evaluate with eyes open the direct attendant risks of accepting criminal responsibility,' then substantial rights were violated." *United States v. Thorne*, 153 F.3d 130, 133 (4th Cir. 1998) (citation omitted). The Government bears the burden to prove an error was harmless. *Hairston*, 522 F.3d at 341; *see also United States v. Vonn*, 535 U.S. 55, 62 (2002).

Golestan is a naturalized United States citizen who was born in Iran. Although Golestan was charged with criminal conduct that began prior to his naturalization, Golestan's pre-naturalization conduct for which he was indicted, arrested, and convicted

12

of after being naturalized could subject him to denaturalization. *See United States v. Jean-Baptiste*, 395 F.3d 1190, 1192–94 (11th Cir. 2005).[3]

The district court erred by failing to inform Golestan of immigration consequences if he entered a guilty plea as mandated by Federal Rule of Criminal Procedure 11(b)(1)(O). Indeed, at oral argument, the Government agreed that the district court's failure to read the warning was error.[4] That does not end our analysis, however. If a criminal defendant demonstrates that the district court abused its discretion by failing to give a Rule 11(b)(1)(O) warning, the burden shifts to the prosecution to prove that the error was harmless.

Here, the Government met this burden. The district court's failure to provide the Rule 11(b)(1)(O) advice did not affect Golestan's substantial rights. The text of the Rule references only immigration consequences for those individuals who are *not* United States citizens. Fed. R. Crim. P. 11(b)(1)(O). At the time Golestan pled guilty, he was a citizen of the United States, and he remains a citizen today. Thus, a warning meant for those who are not United States citizens would not have put Golestan on notice of the potential immigration consequences.

---

[3] The Immigration and Naturalization Act permits the revocation of an individual's naturalization. 8 U.S.C. § 1451(a). The United States has the burden to present "clear, unequivocal, and convincing" evidence to justify revocation of citizenship. *Fedorenko v. United States*, 449 U.S. 490, 505 (1981) (citation omitted).

[4] Because we conclude that the district court erred on this basis, we need not reach the question of whether the district court also erred in concluding that a naturalized citizen is not subject to deportation.

We also emphasize the context in which Golestan entered his plea. Golestan's counsel had informed the district court that he was unable to present evidence that was crucial to Golestan's defense, and the Government had presented overwhelming evidence of Golestan's criminal conduct through the testimony of eight witnesses. Under the circumstances, Golestan has not shown "a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Dominguez Benitez,* 542 U.S. 74, 76 (2004).

## 2. Theory of Prosecution under *Ciminelli*

Golestan and Micfo next contend that the district abused its discretion in denying their motion to withdraw their guilty pleas because they were prosecuted on an invalid theory of criminal liability. Six non-exclusive factors guide the district court's analysis in ruling on a defendant's motion to withdraw his guilty plea. *Mayberry*, 125 F.4th at 141. Those factors include:

> (1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary, (2) whether the defendant has credibly asserted his legal innocence, (3) whether there has been a delay between the entering of the plea and the filing of the motion, (4) whether defendant has had close assistance of competent counsel, (5) whether withdrawal will cause prejudice to the government, and (6) whether it will inconvenience the court and waste judicial resources.

*United States v. Moore*, 931 F.2d 245, 248 (4th Cir. 1991). "The factors that speak most straightforwardly to the question whether the movant has a fair and just reason to upset settled systemic expectations by withdrawing her plea are the first, second, and fourth."

14

*United States v. Sparks*, 67 F.3d 1145, 1154 (4th Cir. 1995). We find no abuse of discretion in the district court's application of the *Moore* factors and its denial of Golestan and Micfo's motion to withdraw their guilty pleas.

The first *Moore* factor requires a criminal defendant to provide "credible evidence" that his guilty plea was not knowing or voluntary. The district court properly found that Golestan and Micfo did not offer credible evidence to meet this first factor. The district court conducted a thorough plea colloquy as to the elements of the offense, and Golestan, as to himself and as to Micfo, represented under oath that he understood. That is sufficient.

The second *Moore* factor considers whether Golestan and Micfo credibly asserted their legal innocence. To meet this burden, Golestan and Micfo must present evidence that 1) has the "quality or power of inspiring belief" and 2) "tends to 'defeat the elements in the government's *prima facie* case' or to 'make out a successful affirmative defense." *Thompson-Riviere*, 561 F.3d at 353 (citations omitted). Golestan and Micfo contend they met this burden. We disagree. Contrary to Golestan and Micfo's contentions, *Ciminelli* does not establish their legal innocence.

In *Ciminelli*, the United States Supreme Court invalidated the "right-to-control" theory of prosecution for federal fraud statutes. 598 U.S. at 308. The Government maintains that *Ciminelli* bears no relevance to this case because Golestan and Mifco were not prosecuted under that theory. Instead, the Government points out that its theory was that

15

the "right to assign, administer, monitor, and regulate IP addresses" is a property interest within the meaning of the federal wire fraud statute.

The federal wire fraud statute criminalizes any "scheme or artifice to defraud, or for obtaining money *or property* by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343 (emphasis added).[5] While the statute covers a broad array of criminal activities, the statutory meaning of "property" is not unbounded. For purposes of the federal fraud statutes, "property" is not limited to tangible things. Certain intangible forms of property, including for example confidential business information, *Carpenter v. United States*, 484 U.S. 19, 25–26 (1987), fall within the definition of property for purposes of the federal fraud statutes.

In line with this precedent and guidance from the Supreme Court that the federal fraud statutes "protect individual property rights," this court has held that "property is anything in which one has a 'right that could be assigned, traded, bought, and otherwise disposed of.'" *McNally v. United States*, 483 U.S. 350, 358 n.8 (1987) (first quote); *United States v. Adler*, 186 F.3d 574, 577 (4th Cir. 1999) (citation omitted) (second quote). In contrast, however, the Supreme Court has resisted considering intangible assets that are an extension of a state's regulatory power as property. *Cleveland v. United States*, 531 U.S.

---

[5] Although this appeal concerns the wire fraud statute, we cite to cases involving the federal mail fraud statute because the federal mail and wire fraud statutes contain identical text in material part and are often analyzed interchangeably. *See, e.g.*, *Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005); *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987).

12, 15, 20, 23 (2000) (holding that a state's interest in unissued state and municipal video poker licenses is not property).

*Ciminelli* involved a criminal bid-rigging scheme. The defendant, Louis Ciminelli, paid a lobbyist with ties to former New York Governor Andrew Cuomo's administration $100,000 to $180,000 to obtain state-funded jobs for Ciminelli's construction company. 598 U.S. at 309–10. As a result of this scheme, a nonprofit entity, Fort Schuyler Management Corporation, awarded Ciminelli's company a major $750 million contract. *Id.* at 310. The Government relied on the so-called "right-to-control" theory. Under this theory, "for the purposes of the elements of mail, wire, or bank fraud, a victim can be deprived of 'property' in the form of 'intangible' interests such as the right to control the use of one's assets." *United States v. Calderon*, 944 F.3d 72, 88 (2d Cir. 2019) (citation omitted). The right-to-control theory "allows for conviction on 'a showing that the defendant, through the withholding or inaccurate reporting of information that could impact on economic decisions, deprived some person or entity of potentially valuable economic information.'" *United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021) (citation omitted).

The government argued that Ciminelli engaged in wire fraud when it deprived Fort Schuyler of "potentially valuable economic information that it would consider valuable in deciding how to use its assets." *Ciminelli*, 598 U.S. at 311. The Supreme Court rejected this right-to-control theory. "'[P]otentially valuable economic information' 'necessary to make discretionary economic decisions' is not a traditional property interest," and therefore is "not a valid basis for liability" under the wire fraud statute. *Id.* at 309. The Court affirmed

17

that "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests." *Id.*

The Supreme Court's holding in *Ciminelli* does not preclude the Government's theory of prosecution in this case. The "right-to-control" theory is a narrow one. In *Ciminelli*, the Supreme Court explained that the "right to information necessary to make informed economic decisions, while perhaps useful for protecting and making use of one's property, has not itself traditionally been recognized as a property interest." 598 U.S. at 314 n.4. The Government did not prosecute Golestan and Micfo on this basis, nor did Golestan and Micfo plead guilty to such elements. The Government alleged that Golestan and Micfo deprived ARIN of IP addresses, not the right to control IP addresses.[6] The Supreme Court has now confirmed that such a "fraudulent-inducement theory" of wire fraud does not contravene *Ciminelli*. *Kousisis v. United States*, 145 S. Ct. 1382, 1398 (2025).

Golestan and Micfo make much of the district court's failure to explain the "traditional wire fraud principles" upon which it relied. [Golestan Opening Br. 19] The district court set forth its reasoning in prior rulings, however. In denying Golestan and Micfo's motion to dismiss the indictment, the district court ruled that the "rights to IP addresses are 'property,' as contemplated by the wire fraud statute." J.A. 52 (quoting *Adler*, 186 F.3d at 576 (4th Cir. 1999)). The Government's indictment was even more clear:

---

[6] Golestan does not press his argument before the district court that IP addresses are not property. We therefore have no occasion to consider whether he could colorably show his legal innocence that way.

Golestan "obtained approximately 757,760 IPv4 addresses" through his fraudulent scheme. J.A. 25. Neither theory depends on a right to control.

Regarding *Moore* factor three, whether there was a delay between when Golestan and Micfo pled guilty and when they filed their motion, the district court did not abuse its discretion in finding that the 17-month lapse constituted a delay. *Compare Moore*, 931 F.2d at 248 (explaining the third *Moore* factor is "whether there has been a delay between the entering of the plea and the filing of the motion" and that a six-week delay weighs against a defendant), *with United States v. Bowman*, 348 F.3d 408, 415–16 (4th Cir. 2003) (agreeing with the district court a three-month delay between the entering of the plea and the motion to withdraw weighed in favor of the defendant).

The fourth *Moore* factor, whether Golestan and Micfo had competent counsel, is easily dispensed with as they concede they did. Although the district court did not address the fifth and sixth *Moore* factors, it was not required to do so. Where a district court's ruling on a motion to withdraw "determines that the first four factors identified in *Moore* militate against granting the defendant's motion, it can reasonably refrain from trying to ascertain just how much withdrawal of the plea would prejudice the government and inconvenience the court." *Sparks*, 67 F.3d at 1154.

We conclude that the district court properly evaluated the relevant *Moore* factors and did not abuse its discretion in denying Golestan and Micfo's motion to withdraw their guilty pleas.

19

B. Golestan's Claim of Ineffective Assistance of Counsel

Golestan next maintains that his trial counsel was ineffective for failing to advise him of the immigration consequences of his guilty plea. He argues that his counsel was required to warn him of the possibility of denaturalization if he pled guilty under *Padilla*. He relies on upon the holding in *Farhane v. United States*, 121 F.4th 353 (2d Cir. 2024). In that case, the Second Circuit, sitting *en banc*, held that under *Padilla*, a naturalized United States citizen has a Sixth Amendment right to be advised by counsel that he could be denaturalized and deported as a result of pleading guilty. *Farhane*, 121 F.4th at 359, 363. We need not address that issue here, however, and we decline to do so.

We review Golestan's claim of ineffective assistance of counsel *de novo*. *United States v. Freeman*, 24 F.4th 320, 326 (4th Cir. 2022). Golestan faces a difficult burden to prove his claim because a claim of ineffective assistance of counsel is not ordinarily cognizable on direct appeal "unless the record conclusively shows ineffective assistance." *United States v. King*, 119 F.3d 290, 295 (4th Cir. 1997) (quoting *United States v. Williams*, 977 F.2d 866, 871 (4th Cir. 1992)); *Massaro v. United States*, 538 U.S. 500, 504–05 (2003). Because the record before us does not conclusively show ineffective assistance of counsel, we decline to consider his claim on direct appeal. *King*, 119 F.3d at 295.

C. Micfo's Guilty Plea

Micfo contends that its guilty plea must be vacated because Golestan was not authorized to enter a plea on its behalf. We decline to vacate Micfo's guilty plea.

We review Micfo's contention that the district court erred in denying its motion to withdraw its guilty plea for an abuse of discretion. *E.g.*, *Thompson-Riviere*, 561 F.3d at

20

352. Contrary to Micfo's contentions, the record supports the district court's findings that Golestan had the requisite authority to enter a plea on Micfo's behalf. In addition, the "Federal Rules of Criminal Procedure provide that an organizational defendant need not be present if represented by counsel who is present." *United States v. Grayson Enters., Inc.*, 950 F.3d 386, 401 (7th Cir. 2020) (citing Fed. R. Crim. P. 43(b)(1)). Micfo was represented by counsel during the plea colloquy, and it has not argued that its counsel was ineffective. The district court therefore did not abuse its discretion in denying Micfo's motion to vacate its guilty plea.

## III. Conclusion

For the reasons set forth above, we affirm in full the judgments of the district court.

*AFFIRMED*